NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ANN HOBERT,**

        **Plaintiff,**

**-vs-**          **Case No. 6:07-CV-1782-ORL-18KRS**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Ann Hobert, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. No. 12, 14.

**I.     PROCEDURAL HISTORY.**

In January 2003, Hobert applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the Supplemental Security Income for the Aged, Blind and Disabled Program

NOT FOR PUBLICATION

(SSI), 42 U.S.C. § 1381, *et seq*. (sometimes referred to herein as the Act). R. 72-74.[1]
She alleged that she became disabled on December 31, 2001. R. 72. Hobert's applications were denied initially and on reconsideration. R. 47, 49, 57-58, 60-62.

Hobert requested a hearing before an administrative law judge (ALJ). R. 54. An ALJ held a hearing on April 19, 2007. Hobert, represented by an attorney, testified at the hearing. Randolph Salmons, a vocational expert ("VE"), also testified. R. 492-527.

After considering the testimony and the medical evidence presented, the ALJ determined that Hobert was insured under OASDI through December 31, 2004. R. 16. The ALJ found that Hobert had not engaged in substantial gainful activity since October 25, 2002, the first date relevant to the disability decision. *Id.*[2]

The ALJ concluded that the medical evidence showed that Hobert had major depression, which was a severe impairment. This impairment did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[3] R.

---

[1] The SSI application is not in the record before the Court.

[2] Hobert had filed a previous application for disability benefits, which was denied on October 24, 2002. Hobert did not appeal that decision to the Appeals Council. Therefore, the present applications consider her condition on and after October 25, 2002. R. 14.

[3] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

17. The ALJ concluded that Hobert did not have any severe physical impairments. R. 17-18.[4]

The ALJ found that Hobert had the residual functional capacity ("RFC") to perform work as all exertional levels, with the following nonexertional limitations:

> She has a moderate limitation affecting her ability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods of time. She is moderately limited in her ability to complete a normal workday and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks. She is moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and maintain socially appropriate behavior and to adhere to basic standard of neatness and cleanliness. She is moderately limited in her ability to respond appropriately to changes in the work setting.

R. 17.

In reaching this conclusion, the ALJ only partially credited Hobert's testimony, noting that when she sought and obtained appropriate mental health treatment her symptoms were generally stable. The ALJ also noted Hobert's activities of daily living. R. 20. The ALJ also gave little weight to the functional capacity assessment prepared by Dr. Thebaud, Hobert's treating psychiatrist, and Lynda Ruf, EdS, because those opinions were inconsistent with Hobert's reported activities of daily living and the information received from Barbara McMahon, a friend of Hobert. R. 20-21. The ALJ also noted that Thebaud and Ruf's opinions were inconsistent with global assessment of functioning

---

[4] Hobert does not challenge this determination. Hobert was advised that any issue not specifically raised in her memorandum would be waived. Doc. No. 13 at 2.

("GAF") scores,[5] which indicated only moderate limitations in social and occupational functioning. R. 21. Instead, the ALJ relied upon the RFC assessment made by L. Reback, Psy.D., after review of Hobert's records. R. 21-22.

Based on the testimony of the VE that Hobert could perform her past relevant work as a kitchen worker and stocker with her current RFC, the ALJ concluded that Hobert could perform these jobs. R. 22. Accordingly, the ALJ concluded that Hobert was not disabled. R. 22.

Hobert requested review of the ALJ's decision. R. 8. On September 7, 2007, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 5-7. Hobert timely sought review of this decision by this Court. Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

After a complete review of the record, I find that the essential facts are adequately set forth in the ALJ's decision and the parties' memoranda. Accordingly, I will only summarize the pertinent facts in this report.

Hobert was forty-five years old at the time of the ALJ's hearing. R. 497. She attended school through the sixth grade. R. 497. She could read and write "enough to

---

[5] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th ed. 1998) (hereinafter *Synopsis of Psychiatry*).

get by . . . ." R. 498.

Hobert previously worked as a telemarketer, store clerk, stocker, and kitchen worker. R. 75-77, 90-96, 148, 503-05. The VE testified about the exertional level and skill required to perform these jobs. R. 520.

Records addressing Hobert's mental impairment reflect that she was hospitalized in April 2002 due to severe suicidal thoughts. R. 326. She again sought emergency room treatment in August 2002 due to complaints of progressively worsening depression over the previous several weeks and daily panic attacks. R. 157. She was admitted and treated with medication. R. 159, 167-68. Anne F. Main, M.D., opined that Hobert had major depression, recurrent and severe but without psychotic features, a mixed personality disorder and a GAF score of 45 at admission and 50 at discharge.[6] R. 157.

Hobert was hospitalized again on August 30, 2002 with the same complaints coupled with thoughts of suicide. R. 169. Dr. Main observed that Hobert had a depressed affect and severely depressed and anxious mood. R. 170. Her assessment of Hobert's condition remained the same, with a GAF score of 40. R. 171. She was treated with medication. R. 171.

---

[6] A GAF score between 31 and 40 is defined as: "Some impairment in reality testing or communication (eg, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (eg, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Synopsis of Psychiatry* at 299. A GAF rating between 41 and 50 reflects: "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (eg, no friends, unable to keep a job). *Id.*

NOT FOR PUBLICATION

During the relevant time, Hobert also was treated at the Volusia County Health Department and at ACT corporation. R. 158-99, R. 350-76. In September 2002, she reported moderate depression and anxiety. R. 374. In December 2002, she reported that her panic attacks were worse, and her medication was adjusted. R. 194. Between March 2003 and May 2004, records reflect a GAF score of 45. R. 188-93. In July 2004, she reported a decrease in stress levels but an increase in anxiety. R. 184. Her GAF score remained at 45. R. 183.

In August 2004, Hobert sought treatment from Adly Thebaud, M.D., a psychiatrist, who is affiliated with Family Psychiatric Services. She reported that she was depressed and that medication "just lev[e]ls me out." R. 253-54. She also had crying spells and difficulty concentrating. She felt socially isolated. She complained of anxiety and mood swings with irritability. R. 254-56. Dr. Thebaud adjusted Hobert's medication. R. 262; *see also* R. 251-53. Dr. Thebaud noted in November 2004 that Hobert's condition was improving. R. 250. In March 2005, Dr. Thebaud responded to an SSA questionnaire. He reported that Hobert had a chronic history of depression with limited response to treatment, but that she could take care of her basic needs. R. 248-49.

In September 2004, A. Alvarez-Mullin, M.D., prepared a mental RFC assessment based on review of Hobert's records. He opined that Hobert would be moderately limited in the following areas: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to set realistic goals or

make plans independently of others. R. 201-02. This equated to an overall assessment that Hobert would have only mild restrictions on activities of daily living and social functioning, but moderate difficulties in maintaining concentration, persistence, or pace. R. 216. Dr. Alvarez-Mullin based this assessment on Hobert's reported activities of daily living and her ability to deal with stressors without resort to alcohol or drugs. R. 203, 219.

On November 19, 2004, Hobert was again admitted to a hospital due to depression and suicidal thoughts. R. 391-92. She was transferred from there to ACT Corporation. R. 394. The intake professional at Act assessed Hobert's GAF score as 35. R. 450.

On April 1, 2005, Lee Reback, Psy.D., prepared a mental RFC assessment after review of Hobert's records. She essentially concurred with Dr. Alvarez-Mullins' assessment with the following additional moderate limitations: the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and, the ability to respond appropriately to changes in the work setting. R. 263-65. Dr. Reback opined that Hobert overall would have moderate difficulties in social functioning and maintaining concentration, persistence, or pace, but only mild restrictions in activities of daily living. R. 277.

Beginning in June 2005, Hobert continued her treatment at Family Psychiatric Services. R. 468. At that time, Hobert reported that she was not sleeping well. *Id.* The

NOT FOR PUBLICATION

intake diagnosis was major depression, recurrent and severe with a GAF score of 52.[7] *Id.* By September 2005, Hobert was feeling better but still having outbursts of anger or crying. Her GAF score was 60. R. 465. Her GAF score remained within the 51 to 60 range through March 2007. R. 461-64, 475-82, 487-91. Despite these medical records, in November 2006 Dr. Thebaud prepared a mental RFC assessment in which he opined that Hobert had poor or no ability to engage in most of the mental abilities and aptitudes needs to do sustained unskilled work. R. 473-74.

Lynda Majure Ruf, EdS, a licensed mental health counselor, treated Hobert from January 2005 through January 2006. R. 469. She opined that Hobert's GAF score in 2006 was between 31 and 40. *Id.* She indicated that Hobert struggled with depression and anxiety on a daily basis. *Id.* She noted that Hobert had the ability to engage in the exertional requirements of work, but that she had a "limited attention span, difficulty concentrating, poor short-term memory, is easily frustrated and has no tolerance for stressors one might encounter in the workplace . . . . Interacting in social situations is extremely anxiety-provoking . . . ." R. 470. Dr. Ruf opined that it was unlikely that Hobert could work without intense supervision and emotional support. *Id.*

During the ALJ's hearing, Hobert testified that she had panic attacks triggered by people being disrespectful to her. R. 515-16. She reported having difficulty with supervisors. She had problems concentrating, and needed detailed instructions. R. 105-06, 125, 501-03. She had mood swings. R. 107. She angered easily and cried

---

[7] A score between 51 and 60 is defined as moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Synopsis of Psychiatry* at 299.

easily. R. 105, 512. She had anxiety attacks two to three times a day lasting between five and thirty minutes. R. 134. She also testified, however, that medication lessened the panic attacks to three to four times a week. R. 514-15. Nevertheless, she had four to five bad days a week. R. 512-13.

Hobert cared for her daughter and two-year-old granddaughter with help from her oldest daughter when she came home from school. R. 101, 506, 509. However, she was alone caring for her granddaughter about six hours a day. R. 507. Her husband came home during the day to check in on her to make sure that she was not upset. R. 506-07. Hobert testified that even when she was stressed, she fed and changed the baby. R. 508.

Hobert was able to care for herself, but some days did not dress. She reported bathing only two times a week. R. 101. She had difficulty sleeping at night. *Id.* She went outside to get the mail, go to church,[8] and to doctors' appointments. She was able to drive. She also reported shopping in stores, often with her mother or her older daughter, and by computer. R. 103-04, 122-23, 510. However, she liked being by herself at home. R. 511. She was also able to pay bills, although her husband had to check her addition. R. 103-04.

Barbara McMahon, a friend of Hobert, completed a function report in February 2005. McMahon wrote that she got together with Hobert about once a week. She noted that Hobert did not get dressed or bathe unless she needed to leave the house. R. 136-37. During the day, Hobert cared for her husband and her eleven-year-old daughter with

---

[8] While Hobert reported going to church in written reports, at the ALJ's hearing she testified that she no longer went to church because she did not feel comfortable there. R. 513-14.

the help of an older daughter. R. 137. She observed that Hobert had a calendar and notes around the house to remember things she had to do. R. 138. She noted that Hobert had difficulty focusing on one thing for any length of time. *Id.* She wrote that Hobert tried to attend church, but suffered anxiety when away from her home. However, she was able to drive and go out alone. She indicated that Hobert could pay bills and count change, but forgot to record checks in the check register. R. 139-40. McMahon observed that Hobert was argumentative and had lots of confrontations with her family. R. 140, 143. She reported that Hobert did not handle stress well. R. 142.

The ALJ posed the following hypothetical question to the VE:

> Let's assume we have an individual who's now 45 years of age, has completed the sixth grade, and has a poor ability to read, write, and use numbers. . . . Let's assume moderate restrictions in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, moderate restrictions to . . . accept instruction and to respond appropriately to criticism from supervisors, maintain a socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness, and to respond appropriately to changes in the work setting.

R. 521-22. The VE responded that this individual could perform Hobert's prior work as a kitchen worker and stocker. R. 523.

The ALJ then posed a hypothetical question in which he asked the VE to consider the limitations set forth in Dr. Thebaud's RFC form. R. 523-25. The VE testified that this individual could not perform Hobert's past relevant work or any other available jobs. R. 525. Similarly, the VE opined that if Hobert's testimony about her panic attacks and

difficulty dealing with people was fully credited, there would be no jobs she could perform. R. 525.

## IV. STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?

-11-

>   (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

NOT FOR PUBLICATION

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.   ANALYSIS.**

Hobert asserts three intertwined grounds supporting reversal. She contends that the ALJ erred by failing to give controlling weight to the mental RFC assessment prepared by Dr. Thebaud and in finding Hobert's testimony about her limitations to be not entirely credible. As such, she submits that the hypothetical question posed to the VE was inadequate because it did not include all of these limitations.

With respect to Dr. Thebaud's mental RFC assessment, "[t]he law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary. . . ." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(internal citations omitted). The Eleventh Circuit has found "'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. . . [and] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.*

The ALJ articulated the following specific reasons to support his decision not to give controlling weight to Dr. Thebaud's mental RFC assessment:

> Dr. Thebaud's assessment . . . [is] not consistent with what the claimant has demonstrated in the course of her daily activities and what a third-party has reported about her daily and social activities. Although Dr. Thebaud . . . states the claimant has a "poor/none" ability to sustain an ordinary routine without special supervision, the claimant takes care of a two-year old child every day, by herself. . . . Lastly, Dr. Thebaud's assessment is inconsistent with multiple GAF assessments which indicate only "moderate" limitations affecting social and occupational functioning.

R. 21.

The ALJ's reasons are supported by substantial evidence in the record. As discussed above, Hobert cared for her young grandchild during the day without assistance except for occasional visits by her husband. McMahon, the third-party to whom the ALJ referred, noted that Hobert could go out alone to shop and attend church. Moreover, Dr. Thebaud's treatment records reflect that Hobert's condition improved with medication. He assessed her GAF scores as between 52 and 60, which are indicative of moderate limitations. In light of this evidence, good cause existed not to give controlling

NOT FOR PUBLICATION

weight to Dr. Thebaud's assessment that Hobert had poor or no ability to engage in most of the mental requirements of work.

With respect to Hobert's credibility, the United States Court of Appeals for the Eleventh Circuit applies what has become known as the "pain standard" to assess subjective symptoms, including pain.

> Under the pain standard followed in this circuit, the Commissioner "must consider a claimant's subjective testimony of pain if [he] finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from the condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain."

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). Once these elements are met, the ALJ must then determine the functional limitations arising from the subjective symptoms. This is a credibility determination, in which the ALJ considers the effectiveness of medication and the individual's ability to perform daily activities, among other things. *See, e.g,* Soc. Sec. R. 96-7p, 1996 WL 374186, at *3 (July 2, 1996). If the ALJ discredits the claimant's subjective testimony, he "must articulate explicit and adequate reasons for doing so." *Foote*, 67 F.3d at 1561-62.

Here, the ALJ explicitly found that Hobert had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. R. 20. He found, however, that Hobert's testimony "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* In support of this finding, the ALJ again cited Hobert's ability to care for her granddaughter, her ability to engage in activities of daily living described above, and the medical records that reflect

NOT FOR PUBLICATION

that Hobert's symptoms were generally stable with mental health treatment. All of these findings are supported by substantial evidence in the record. Therefore, the ALJ did not err in his assessment of Hobert's credibility.

The ALJ incorporated into his RFC assessment mental functional limitations consistent with his determination that Hobert had moderate limitations in social functioning and concentration, persistence and pace, and posed a hypothetical question to the VE that included those limitations. The VE testified that there was work that Hobert had previously performed to which she could return with that mental RFC. The ALJ was not required to include additional limitations in the question to the VE that he found not to be supported by the evidence. *See May v. Comm'r of Soc. Sec.*, 226 Fed. Appx. 955, 960 (11th Cir. 2007).

## VI.   RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**. I further recommend that the Court direct Clerk of Court is directed to issue a judgment consistent with its order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** this 5th day of December, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE